ELY-WALKER DRY GOODS COMPANY, Appellant, v.
McLAUGHLIN, DYER & COMPANY, Defendants;
E. A. MANSUR et al., Interpleader, Respondents.

**St. Louis Court of Appeals, February 12, 1901.**

1. **Interpleader, Nature of:** PLEADING AND PRACTICE: ATTACH-
MENT: ACTION: DEFINITION. An interplea is another action
ingrafted on the original suit, in which the interpleader becomes the
plaintiff, and the attaching plaintiff the defendant. It is in no sense
a part of the original cause of action out of which it springs, but the
assertion of an independent right which must be tried and deter-
mined separately on its own facts.

2. ———: ———: EVIDENCE: IMPEACHMENT OF WITNESS BY
A DOCUMENT: PRACTICE, TRIAL. A document can not be ad-
mitted to impeach a witness unless a foundation is first laid by in-
terrogating him about it or by eliciting an admission from him that
he signed it.

3. **Bill of Exceptions, Evidence Preserved in:** STATUTORY CON-
STRUCTION: WITNESS. When the statute (section 3149, Re-
vised Statutes 1899) authorizes the use of "competent evidence" pre-
served in a bill of exceptions, it means such as is competent by the
settled doctrines of the law of evidence, not something manifestly
incompetent by those documents which got into the record either by
express consent or by no objection being made to them.

4. ———: ———: AFFIDAVIT IN BILL OF EXCEPTIONS. In the
case at bar, the affiant was never cross-examined, as his evidence at
the first trial was neither delivered by deposition nor from the stand,
but in the form of an affidavit, and this affidavit does not fall within
the meaning of the law as contained in section 3149, Revised Stat-
utes 1899.

5. ———: ———: INCOMPETENT TESTIMONY, OBJECTIONS TO,
WHEN MADE: WAIVER. Because a party may have waived his
right to object to incompetent testimony on the first trial rather
than suffer great delay or inconvenience, does not render it admis-
sible over objections at all subsequent trials simply because it goes
into a bill of exceptions.

6. ——: ———. Section 3149, Revised Statutes 1899, intended to permit contradictory matter to be proven in the contingency arising in the case at bar without a previous predicate, and there was no error committed in receiving in evidence the rebutting affidavit of Dyer, contained in the bill of exceptions.

Appeal from Howell Circuit Court.—*Hon. W. N. Evans,* Judge.

AFFIRMED.

*Sebree & Farrington* and *W. J. Orr* for appellant.

(1) Whenever any competent evidence shall have been preserved in a bill of exceptions in a cause, the same may be thereafter used in the same manner and with like effect as if such testimony had been preserved in a deposition in said cause, but the party against whom such testimony of a witness may be used, shall be permitted to prove any matters contradictory thereof as though such witness were present and testifying in person. R. S. 1899, sec. 3149; Padley v. Cattelon, 64 Mo. App. 629; Lumber v. Hoss, 67 Mo. App. 264. (2) A proper foundation must be laid before proof of contradictory statements of a witness are admissible. Leahey v. Railway, 97 Mo. 165; Carder v. Primm, 52 Mo. App 102 at 108; 115 U. S. 69. (3) Declarations are not admissible except by way of impeachment. Fanny v. The State, 6 Mo. 122. (4) Where it is attempted to impeach the credit of a witness by proof of contradictory written statements, the writing, if in existence, must be shown to the witness. Prueitt v. Martin, 59 Mo. 325. (5) If it is intended to impeach a witness by statements out of court, attention must be called to the time, place, etc. Gregory v. Cheatham, 36 Mo. 155; State v. Grant, 79 Mo. 132.

*F. M. Mansfield, C. F. Evans* and *A. H. Livingston* for respondents.

(1) The statute under which plaintiffs read in evidence, from the bill of exceptions filed in the cause on former trial, is as follows: "Whenever any competent evidence shall have been preserved in any bill of exceptions in a cause, the same may thereafter be used in the same manner and with like effect, as if such testimony had been preserved in a deposition in said cause, but the party against whom such testimony of any witness may be used shall be permitted to prove any matters contradictory thereof, as though such witness were present and testifying." R. S. 1899, sec. 3149. While, as far as we know, this section has received no judicial construction, it is. evident that it was never intended by the Legislature that it should open wide a way to fraud and imposition. If it should receive the construction contended for by appellants such would be its effect. Take this case, and the evil results of such a construction would be apparent. The plaintiffs filed their application for continuance, in which is set out the facts it is alleged the witness would testify to. In order to avoid delay it is admitted that witness, if present, would testify to such facts. This statement is contained in a bill of exceptions, and a new trial is finally granted. But, aside from the statute, no error was committed, and the introduction of the affidavit was proper. Even if Dyer had been present and testified, his affidavit could have been introduced, or if he had testified by deposition or otherwise, because he is a party to the record. Plaintiffs make a witness of him to establish their cause of action against interpleaders (respondents), hence it was not necessary to lay any foundation to impeach him, because he is a party to the record. All that was necessary was to show that he made the affidavit introduced by respondents, which was

done by the witness, Evans, who wrote the affidavit and saw Dyer sign it and make affidavit thereto. Owens v. Railway Co., 95 Mo. 169; State v. Young, 99 Mo. 666. (2) But aside from the statute and aside from the fact that Dyer was a party to the record, and a witness, the introduction of his affidavit to contradict him was proper. When it is sought to contradict a witness by a writing, it is not necessary to call his attention to its contents, but only necessary to show that he signed it. It was once the law of this State that a witness could not be contradicted by the introduction of his writing without calling his attention to it. Gregory v. Cheatham, 36 Mo. 156.

GOODE, J.—This cause was here on a former appeal (78 Mo. App. 578), when the judgment recovered by the interpleaders was reversed and the cause remanded for error of the trial court in refusing proper instructions requested by the plaintiff. The suit was by attachment; goods attached as the property of McLaughlin, Dyer & Company were sold; for the proceeds Mansur & Ellis interpleaded. On the second trial interpleaders again recovered judgment; plaintiff appealed.

To sustain the interplea respondents offered and read in evidence the following bill of sale and rested their case:

"Know all men by these presents, that in consideration of $2,300 (the receipt of which is hereby acknowledged), we do grant, bargain, sell, transfer and deliver unto W. C. Ellis and E. A. Mansur, the following goods and chattels, viz.: All of the stock of general merchandise, consisting of dry goods, groceries, hats and caps, boots and shoes, and all merchandise, including show-cases, safe, and fixtures, now owned by us as the firm of McLaughlin, Dyer & Company, in the building we now occupy in Mountain Grove, Wright county, Missouri, to have and to hold all and singular the said goods

and chattels forever.   We hereby covenant with said grantees that we are the lawful owners of said goods and chattels, that they are free from all incumbrance, and that we have the right to sell the same as aforesaid, and that we will warrant and defend the title against the lawful claims of all persons whomsoever.   In witness whereof, the grantors have hereunto set their hands this fourteenth day of July, 1897.

(Signed).                    "McLaughlin Dyer & Co.,

"C. M. Dyer,

"W. A. O'Dell,

"W. J. McLaughlin."

Appellants offered and read in evidence the following testimony of C. M. Dyer, taken in the form of an affidavit, as contained in the bill of exceptions filed on the first appeal, to-wit:

"State of Missouri, }
                     } ss.
County of Jackson.  }

"C. M. Dyer, of lawful age, being duly sworn, states that he is one of the members of the firm of McLaughlin, Dyer & Co., engaged in business in the town of Mountain Grove, Mo., in November, 1896, and at that time the firm consisted of himself and F. J. McLaughlin.   That in January, 1897, W. A. O'Dell bought an interest in the business of McLaughlin & Dyer, and from that time the business was conducted under the name of McLaughlin, Dyer & Co.   That in January, 1897, when O'Dell bought into the firm, McLaughlin & Dyer were owing Mansur & Ellis a note of $3,735, which had been reduced by payments to between $2,500 and $2,900.   That said O'Dell executed his two promissory notes direct to Mansur & Ellis for $750 each, due in six and twelve months after date, respectively, which notes were secured by a deed of trust on the farm of the said O'Dell.   That at the time these notes were executed and O'Dell was given an interest in the firm,

it was agreed that the original sum of $1,500 should be credited on the original note of McLaughlin & Dyer.   That afterwards, in the month of July, 1897, the firm of McLaughlin, Dyer & Co., was indebted to mercantile creditors to the amount of about $1,100 or $1,200, and was also owing Mansur & Ellis, a balance on the original note of $3,735, about $800. That on the fourteenth day of July, 1897, E. A. Mansur came to the store of McLaughlin, Dyer & Co., and an agreement was made by this affiant, representing McLaughlin, Dyer & Co. on the one side and by Mansur, representing Mansur & Ellis, on the other, to secure said indebtedness due Mansur & Ellis, by turning of the stock of goods to Mansur & Ellis for them to get their money out of it.   That said Mansur agreed to take said stock and dispose of the goods to the best advantage and after the $2,300 due himself and Ellis was paid to turn back the surplus, if any, to the firm of McLaughlin, Dyer & Co.   That a bill of sale was executed by McLaughlin, Dyer & Co., to Mansur & Ellis to this stock of goods, and possession was delivered to them that evening.   No invoice of said stock of goods was taken, for the reason that it was the agreement that whatever remained after paying the indebtedness of Mansur & Ellis should be turned over to McLaughlin, Dyer & Co. or their creditors.   Affiant believed at that time that the value of the goods was as much as $4,000, as is shown by their books. That affiant would not have consented to a straight sale of the goods for the sum of $2,300 as expressed in the bill of sale without first taking an invoice and ascertaining the value of the stock.   That when this agreement was made with Mr. Mansur , no one else was present, but that affiant afterwards told his partners of the agreement and a bill of sale was executed with the understanding that the goods were turned over to Mansur & Ellis as a security.

(Signed).                              "C. M. Dyer.

"Subscribed and sworn to before me this twenty-fourth day of January, 1898. (My commission expires May 24, 1901.)

"Bayard T. Buchanan,

"Notary Public, Jackson County."

Respondents after proving the fact that C. M. Dyer signed and swore to the following affidavit, read the same as evidence in rebuttal, to-wit:

"State of Missouri,

ss.

County of Jackson.

"C. M. Dyer, being duly sworn, says that he is one of the members of the firm of McLaughlin, Dyer & Co., which was engaged in business at Mountain Grove, Mo., about 1896, and at that time the firm consisted of himself and F. J. McLaughlin, and that in January, 1897, W. A. O'Dell bought an interest in the business of McLaughlin & Dyer, and from that time the business was conducted under the name of McLaughlin, Dyer & Co. That in July, 1897, and for a long time prior thereto, the firm of McLaughlin, Dyer & Co., was indebted to Mansur & Ellis, of Mountain Grove, Mo., in the sum of $2,300. That on the fourteenth day of July, 1897, an agreement was made between the said firm of McLaughlin, Dyer & Co., and Mansur & Ellis to turn over the stock of goods belonging to the said McLaughlin, Dyer & Co., to the said Mansur & Ellis, in payment of said $2,300 indebtedness. That a bill of sale was executed and said stock of goods was delivered to Mansur & Ellis on the said fourteenth day of July, 1897, by said McLaughlin, Dyer & Co. in payment of the aforesaid indebtedness. That the said sale was unconditional and absolute, and that there was no agreement or understanding between said parties that anything was to be paid back to the said McLaughlin, Dyer & Co., or to any one else.

(Signed). "C. M. Dyer.

"Subscribed and sworn to before me in Kansas City, Jackson county, Missouri, on this tenth day of August, 1899.

"J. H. Heath, Notary Public.

"(My commission expires November, 15, 1900.)"

The plaintiff admitted that the goods attached were sold by the sheriff under an order of court, that the proceeds are in his hands and the goods were in the possession of the interpleaders at the time the writ of attachment was levied.

To the reading of this affidavit as evidence appellant objected, on the ground that it was incompetent; that no proper foundation had been laid for its introduction, and because it was ex parte affidavit of Dyer not taken in the presence of plaintiff or its counsel. The objection was overruled and appellant saved its exception. The only error assigned by appellant is the admission of the Dyer affidavit in rebuttal.

Respondents' position, that it was competent because the affiant, C. M. Dyer, is a party to the record, is untenable. He is not a party in interest nor indeed a party at all in the controversy between the appellant as attaching creditor and Mansur & Ellis, the interpleaders. An interplea is another action ingrafted on the original suit, in which the interpleader becomes the plaintiff, and the attaching plaintiff the defendant. It is in no sense a part of the original cause of action out of which it springs, but the assertion of an independent right which must be tried and determined separately on its own facts. Water Pierce Oil Co. v. American Exchange Bank, 71 Mo. App. 653.; Brownell & Wight Car Co. v. Barnard, 139 Mo. 142; Giett v. McGannon, Mercantile Co., 74 Mo. App. 209. Moreover, when the contradictory statements of a party to the action are offered for impeaching purposes instead of as admissions against interest, it is held that a foundation must be first laid as with other witnesses. Conway v. Nicol, 34 Iowa 536; Browning v. Gosnell, 59 N. W. Rep. 340.

Ely-Walker Dry Goods Co. v. Mansur.

It is further urged that the affidavit was incompetent in rebuttal because when inpeaching testimony is contained in a writing, the paper may be introduced, on proof that the witness signed it, without his attention being called to it or examining him about the contents. We think the converse of this proposition is the rule in this State and generally. Respondents concede it formerly was, but say the later decisions have changed it, citing in support of their views, State v. Stein, 79 Mo. 330; State v. Gonce, 87 Mo. 627 and State v. Matthews, 88 Mo. 121. We find nothing in those cases to countenance such a doctrine or shake the authority of the practice so long observed, that a document can not be admitted to impeach a witness unless a foundation is first laid by interrogating him about it or eliciting an admission from him that he signed it. In each of the three cases mentioned, the opinion distinctly states that this course was followed and the necessity of following it is recognized. There is no decision to the contrary in this State and but few in other jurisdictions. The reason assigned for the rule is that a witness should, in common fairness, be afforded an opportunity to explain the circumstances under which the alleged inconsistent statements were made, why he made them, what they mean and how they may truthfully consist with the testimony he has given on the stand. Apparently conflicting versions of affairs are not always actually so. One may have been made under compulsion, or a misapprehension of the facts which was corrected later; may have been incorrectly understood by the person to whom it was given, or the memory of a witness when refreshed by inquiry may enable him to recall which account is correct, and in various ways apparent conflict may be reconciled and an honest person avoid unjust suspicion. So the principle holds in most jurisdictions where the common law prevails, that a party will be denied the benefit of impeach-

ing evidence unless he offers to use it in a manner fair to the other side and to the witness by directing the latter's attention to it so that he may furnish such explanation as he desires. Gregory v. Cheatham, 36 Mo. 156; Prewitt v. Martin, 59 Mo. 325; State v. Grant, 79 Mo. 113; Wilkerson v. Eilers, 114 Mo. loc. cit. 252.

Was the rebutting affidavit competent by virtue of the statute which allows evidence contained in a bill of exceptions to be read on a subsequent trial? The section is as follows: "Whenever any competent evidence shall have been preserved in any bill of exceptions in a cause, the same may thereafter be used in the same manner and with like effect, as if such testimony had been preserved in a deposition in said cause, but the party against whom such testimony of any witness may be used shall be permitted to prove any matters contradictory thereof as though such witness were present and testifying." R. S. 1899, sec. 3149. Does the last clause give the party, against whom the testimony of a witness contained in a bill of exceptions has been read, the right to prove contradictory statements, either verbal or written, made by him without laying the foundation usually required as a prerequisite? This inquiry is *res nova* and merits careful consideration, for the exigencies of trials may make it important occasionally to the proper determination of causes. In the particular instance before us, the affiant Dyer was never cross-examined as his evidence at the first trial was neither delivered by deposition nor from the stand, but in the form of an affidavit. The document itself as preserved in the record shows as much, while it is stated in the respondents' brief, and not denied, that it was introduced on the first trial by being copied into an application for a continuance made by the plaintiff as what Dyer would testify if present. To avoid delay the interpleaders admitted he would so swear and the affidavit became

evidence for the jury. An appeal, was taken, a bill of exceptions containing it filed, the cause was reversed and another trial came on in the course of which the affidavit was admitted again, this time under the provisions of the above-mentioned statute. The language of the section shows clearly, we think, that it was inadmissible. When the statute authorizes the use of "competent evidence" preserved in a bill of exceptions it means such as is competent by the settled doctrines of the law of evidence, not something manifestly incompetent by those documents which got into the record either by express consent or by no objection being made to it. The affidavit does not fall within the meaning of the law. Evangelical Synod v. Schoeneich, 143 Mo. loc. cit. 658.

Because a party may have waived his right to object to incompetent testimony on the first trial rather than suffer great delay or other inconvenience, this does not render it admissible over objections at all subsequent trials simply because it goes into a bill of exceptions. Here the respondent never had a chance to cross-examine Dyer, which is of the essence of the question of admissibility. On the other hand, as they were able to secure another affidavit from him contradicting the one offered by the appellant, they knew his whereabouts and it is fair to presume could have procured his attendance at the trial or his deposition on notice to the other side and thus have obtained the benefit of the rebutting evidence contained in the second affidavit after laying a foundation therefor in the ordinary mode. There are, therefore, no circumstances of hardship entitling them to special leniency.

But such may easily arise in other cases. The contradictory statements offered, to break the force of the evidence read from the bill of exceptions, may have been made after the first trial to persons present and ready to swear to them, whose testimony would be excluded because the witness had not

been asked about the matter, when perhaps it was impossible
to ask him.   His whereabouts might be unknown or inacces-
sible.   It would result that his previous testimony contained
in the bill of exceptions would redound to the benefit of the
side for which it was given, despite his absence or death,
while the other side on that account, would be deprived of the
benefit of his contradictory statements.   Besides, it would be
harsh to require a party to an action to anticipate the intro-
duction of evidence by his adversary from a bill of exceptions
instead of from the stand and to prepare the way for impeach-
ment by finding the witness and examining him.   Witnesses
are usually more under the control of the party to whom their
testimony is favorable than of the opposite party.   To insist
on a predicate for statements contradicting evidence read from
a bill of exceptions would impose on a party a heavier obliga-
tion to procure the attendance or depositions of his adversary's
witnesses than the latter is under himself.   But the inconven-
ience or burden has not always sensibly influenced the courts
in instances germane to this one, as we shall see, and the impor-
tant question is the meaning of the statute.   We are not alto-
gether without authorities to shed light on the subject.   The
competency of similar secondary evidence in exceptional cir-
cumstances at common law is of ancient date in both civil and
criminal cases.   Sometimes it is held admissible only if the
witness is dead or insane, but the prevalent doctrine is that it is
enough to show his presence or deposition is not obtainable,
either on account of extreme illness, insanity, his being be-
yond the reach of process, concealed by the opposite side, or
perhaps other causes.   The secondary proof has been admitted
in different forms:   subscribed statements at a coroner's in-
quest or preliminary examination, oral testimony, as to what
an absent witness swore to on a previous trial, depositions
taken in a different cause between the same parties or their

privies involving the same issues and testimony preserved in bills of exceptions. State v. McO'Blenis, 24 Mo. 402, in which Judge RYLAND delivered a learned dissenting opinion; State v. Houser, 26 Mo. 431, where Judge NAPTON supports the doctrine with equal learning; State v. Able, 65 Mo. 357; Jaccard v. Anderson, 37 Mo. 91; Morris v. Hammerle, 40 Mo. 489; Parsons v. Parsons, 45 Mo. 265; Borders v. Barber, 81 Mo. 636; Scoville v. Railway Co., 94 Mo. 84; Leslie v. Rich Hill Coal Mining Co., 110 Mo. 31; Franklin v. Zimmerman, 11 Mo. App. 306; August Wine Co. v. Weippert, 14 Mo. App. 483; 1 Greenl. Ev., sec. 163.

In determining the admissibility of the proof, great stress is laid by the later cases on the opportunity to cross-examine, which is held in all the adjudications we have noticed to be a necessary condition of its admission. State v. Houser, 26 Mo. loc. cit. 436; Jaccard v. Anderson, 37 Mo. loc. cit. 95; Mattox v. United States, 156 Mo. 237; Emerson v. Navarro, 31 Texas 334.

Authorities elucidating the right to prove contradictory statements when such secondary evidence is introduced, and defining its limits, are found in the reports but are far from being harmonious, inclining on the whole to support the rule that such impeaching or contradictory matter can not be received without a foundation, regardless of whether it was possible, under the circumstances, to lay one or not. But the current to this effect is broken by well reasoned decisions of respectable courts to the contrary, and in some instances strong dissents have weakened the force of the majority opinion. The wisdom or propriety of requiring a basis to be laid in any case has been drawn in question and in several States the rule is rejected as being no substantive doctrine of the law but simply a usage or practice. Hedge v. Clapp, 22 Conn. 262; Tucker v. Welsh, 17 Mass. 160. Be that as it may, it has

been impregnably intrenched in the procedure of the English and most American courts since the opinion of the judges in the Queen Caroline's case, 2 Broad. & Bing. 284, and is settled doctrine in this State. Leahy v. Cass Ave. R'y Co., 97 Mo. 165; State v. Grant, 79 Mo. 132; State v. Smith, 114 Mo. 406; Gregory v. Cheatham, 36 Mo. 155; Carder v. Primm, 52 Mo. App. 102. So rigidly is the practice adhered to that it has been held that a statement subsequently made at variance with testimony given in a deposition could only be proven by suing out a new commission and examining the witness concerning them. Gregory v. Cheatham, 36 Mo. supra; Kimball v. Davis, 19 Wend. 437; Brown v. Kimball, 25 Wend. 259; Stacy v. Graham, 14 N. Y. 492; Conrad v. Griffey, 16 How. (U. S.) 27; Georgia Railroad v. Smith, 85 Ga. 532; Killion v. Railroad, 79 Ga. 234; 11 Am. St. R. 410. Where the contradictory statements were made before the deposition was taken, but the attention of the witness was not called to them and he afterwards died, the following authorities decide they should be excluded. Ayers v. Watson, 132 U. S. 394; Hubbard v. Briggs, 31 N. Y. 536; Eppert v. Hall, 133 Mo. 417; Sharp v. Hicks, 21 S. E. 208. And where a party admits, to avoid a continuance, that a witness if present would testify to certain material facts, he can not prove counter-declarations by him at another time and place. Pool v. Devens, 30 Ala. 672; St. Louis R. Co. v. Sweet, 57 Ark. 287; State v. Bartley, 48 Kan. 421; North Chicago Mfg. Co. v. Ellingham, 44 Illinois 46. Extreme instances of the application of the rule may be found. State v. Pruitt, (1890), 92 Ala. 41, was an indictment for burglary. One of the witnesses for the State (Bates) who testified at the preliminary examination and also on habeas corpus proceedings, was absent from the State when the trial came on, and on proof of that fact the prosecuting witness whose house had been burg-

larized, was permitted to relate to the jury the substance of said Bates' testimony at the two hearings aforesaid. The matter thus given was very damaging to the defendant and being assigned for error on appeal, was held competent. The defendant offered to prove Bates had made statements in conflict with those testified to by the prosecuting witness, which evidence was excluded. The Supreme Court upheld this ruling in the opinion: "It was not competent to show that the absent witness had made statements different or contradictory to those proven to have been testified to by him on the former trials and there was no predicate for such impeaching testimony. In all such cases it is necessary to first interrogate the witness himself as to such contradictory statements giving time and place with reasonable certainty." In Texas where a witness had become insane, and his testimony at the examining trial being read to the jury, contradictory statements made by him thereafter were held properly excluded on the ground that no foundation for them had been laid. State v. Stewart, 26 S. W. 203. This case was ignored in State v. Hamblin, infra, and the contrary doctrine adopted. In Kentucky the evidence of a deceased witness was admitted, whereupon it was proposed to prove he had subsequently confessed it was false but this was decided to be incompetent. Craft v. Commonwealth, 81 Ky. 250; 50 Am. Rep. 160. A precisely similar ruling was made by the Federal Supreme Court, but three of the justices concurred in a strong dissenting opinion. Mattox v. United States, 156 U. S. 237. In Runyan v. Price, 15 Ohio St. 1; 86 Am. Dec. 459, which was to set aside a will, the holding was that contradictory statements of a witness were incompetent to rebut his testimony read from a bill of exceptions although they were made after the trial and he had died meanwhile. Two judges out of five dissented from this view.

The reasons assigned for these decisions are the respect due to the witness, and certainly this is carried to the extreme limit, and the danger of perjured evidence being used to impeach him. The danger of falsehood in the secondary evidence which might work irreparable mischief, is seemingly overlooked.

On the other hand, there are authorities taking a more generous view which make an exception when it is impossible to lay a predicate for the contradictory matter and admit it without. Among these are Wright v. Little, 3 Burr. 1255, decided by Lord Mansfield, and Aveson v. Kinnaird, 6 East. 195, by Lord Ellenborough. The first case was ejectment and the title turned on a will. Both the subscribing witnesses being dead, proof was given in the usual way of their handwriting. A declaration afterwards made by one of them that he had forged the instrument was admitted, and by the chief justice and all of the judges this was held proper matter for the jury. The other case is not in point except that Lord Ellenborough in the course of his opinion referred with approval to a ruling by Justice Heath letting in testimony that an attesting witness, whose hand-writing had been proven to support a bond, had asked pardon of heaven for being concerned in the forgery of it. The evidence was admitted on the ground that if the witness had testified at the trial he could have been cross-examined and, therefore, his declarations might be proven in contradiction of the presumption of due execution of the bond. Chief Justice Parker emphatically disapproved the rejection of contradictory declarations when the witness was dead, saying: "Suppose a witness who has once testified should afterwards acknowledge the falsity of his statements and then die; the party interested in his testimony might upon another trial prove what he had once said upon the stand under oath; and shall not the other party

be permitted to prove that what he said was a falsehood?"
The question arose in Louisiana and the impeaching testi-
mony was held properly admitted, it having been shown that
reasonable efforts to find the witness and take his deposition
had proven fruitless. Fletcher v. Hensley, 13 La. Am. 191.
In Holman v. Bank of Norfolk, 12 Ala. 408, it was decided
that witnesses might be contradicted by their depositions given
in another cause without first calling their attention to the mat-
ter. The case was one in equity, and they having deposed in it,
their former depositions were offered. "It is objected, that
the attention of the witnesses should have been called to those
statements previously made, that they might have an opportu-
nity to explain them, but we can find no such qualification
annexed to the right of introducing a previous deposition for
the purpose of discrediting a witness. The rule here adverted
to, is the one settled in the Queen's case, 2 B. & B. 313, and
which has been frequently acted upon and affirmed in this
court. The rule, by the very terms in which it is propos-
ed, applies to the oral examination of witnesses proposed to
be impeached by acts done or declarations made relating to
the cause. It can not, in the nature of things, apply to such
a case as this, because, until the last deposition is taken, it can
not be known that there will be any discrepancy between them.
These depositions must, therefore, be looked, to, so far as they
contradict the statements last made." In Hamblin v. State,
34 Tex. Crim. R. 368, the evidence of the deceased taken at
the examining trial was introduced and it was held that con-
tradictory statements impeaching that evidence was legitimate
and competent although it was not offered as dying declarations
and no predicate for impeachment was laid. The opinion is
a strong one and the reasons assigned for the ruling impressive:

"As set forth in the bill, the evidence should have been
admitted. The State having introduced the evidence of the

deceased witness, it was not necessary for appellant to lay the usual predicate for the introduction of impeaching testimony. It was impossible to do so.   Upon this question the decisions may be divided, but it would seem to us that justice would demand that such evidence should be admitted where the State introduces the evidence of a deceased witness.   The rule that it is unfair to attack the credit of such a witness without affording an opportunity to explain should be subordinated to the rights of the accused, whose life is sought, as well as the higher interests of society.   The law which is seeking the life and liberty of the citizen for an alleged infraction of its provisions, has thrown around that citizen the presumption of innocence and the reasonable doubt of guilt under the evidence; and it would be a harsh rule, indeed, to admit the evidence of a witness given on another trial and make this evidence absolutely true by eliminating all opportunity of discrediting it. This would seem to obliterate the hope of eliciting the truthfulness of such testimony, and leave the accused at the mercy of the evidence of a witness who may have admitted the falsity of his statements and his corrupt motives for so testifying. If the rule be a sound one that the evidence of a dead witness can be reproduced, then it should follow that his testimony could be attacked in any way that any other witness may be impeached.   In his work on Evidence, Mr.   Stephens   says: 'Whenever in any declaration or statement made by a deceased person relevant or deemed to be relevant, under articles 25-33, both inclusive, or any deposition is proved, all matters may be proved in order to contradict it, or in order to impeach or confirm the credit of the person by whom it was made which might have been proved if that person had been called as a witness, and had denied upon cross-examination the truth of the matter suggested.'   Steph. Dig. Ev., p. 191, art. 135.   See same work, article 32 and note 22 in appendix.   The writer is una-

ble to perceive the distinction between impeachment of dying declarations, by proving contradictory statements, and thus attacking the reproduced testimony of the witness taken on an examining trial, whether the same reason would or would not operate to authorize the introduction of such dying declarations or examining trial evidence as original testimony. That dying declarations may thus be impeached is well settled, we think, and correctly so.    *    *    *    The life and liberty of the citizen is worth more than the supposed fairness or unfairness of the treatment of a witness.  To our minds the doctrine is too harsh for toleration, that the life of the accused may be taken on such evidence, and yet he be denied the right to impeach the veracity of the witness who gives such testimony."

The analogy of such contradictory statements to those received in rebuttal of dying declarations has been pointed out in other instances with the comment that on principle they should be admitted without a basis when it was impossible to lay one.  It may be said, too, that they are then competent by what Greenleaf calls, "the most transcendent and universal rule; that in all cases, that evidence is good than which the nature of the subject presumes none better to be obtainable." 1 Greenleaf Ev., secs. 348, 349.  The statute under consideration is analogous to section 687, Revised Statutes 1899, concerning the proof of contradictory statements made by an absent witness when what it is claimed he would testify if present, is read from an application for a continuance.  But the requirements imposed on the party seeking to impeach the witness might properly be made more strict in the latter case, because it is optional with him to either admit the statement or have the cause continued.  It can not be introduced against his will.  Besides the provisions of section 687 are in derogation of the rights of the party reading the statement, whereas, the other section is for his benefit.

It will be seen from the foregoing review of the subject that the authorities are irreconcilable as to the proper course to be pursued in regard to statements tending to impeach evidence given at a former trial when no preliminary questions were put to the witness because it was impossible to do so. These decisions were at common law, but they assist, or would if harmonious, in ascertaining the meaning of our statutory provision that contradictory matter may be proven if the evidence is read from the bill of exceptions as though the witness were present and testifying. If it means that a predicate must be laid, the proviso is useless; it would be at most simply declaratory of the common law as it existed if the rule in this State was against the admission of such evidence prior to the enactment of the statute. There was no need to add anything after the clause, that the evidence might be used in the same manner and with like effect as if preserved in a deposition. A cardinal precept of construction is that meaning and efficacy must be given to all of the words of an act if possible. Riddick v. Walsh, 15 Mo. loc. cit. 536; City of St. Louis v. Lane, 110 Mo. 254. To do this with the statute in question, it is necessary to hold that the Legislature intended, when a party prefers to read from a bill of exceptions rather than to have his witnesses present, or to take their depositions, that his adversary shall have the right to rebut the evidence without laying a predicate. He may avoid this risk by introducing their testimony in the ordinary mode. The statute requires no showing that the evidence could not be procured in the usual way as a condition to introducing secondary proof, although doubtless the other side could compel the examination of the witnesses from the stand by having them present.

But should a litigant enjoy the privilege of keeping out impeaching evidence by using old testimony instead of reproducing it? The just view of the law is that the side against

whom the secondary testimony is used shall not thereby be debarred from contradicting it, or put to unusual effort in order to do so. The modern tendency of jurisprudence is towards admitting instead of rejecting evidence. Narrow rules and judicial policies favoring exclusion have been largely abrogated by remedial legislation, and while statutes to alter the common-law doctrine of evidence are generally strictly construed, a construction tending to unjust consequences or unreasonable requirements ought to be avoided. In our opinion the present law intended to permit contradictory matter to be proven in the contingency in question without a previous predicate, unless it may be in criminal cases where a constitutional right is involved. It follows that the court below did not err in receiving in evidence the rebutting affidavit, and as this is the only error assigned the judgment is affirmed. All concur.